# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| ARCHIE DONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-2773-STA-tmp |
| | ) | |
| BUCKMAN LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Buckman Laboratories's Motion for Summary Judgment (D.E. # 21) filed on February 1, 2012. Plaintiff Archie Donald has filed a response in opposition (D.E. # 26), and Defendant has filed a reply brief (D.E. # 29). For the reasons set forth, Defendant's Motion is **GRANTED**.

## BACKGROUND

The following facts are not in dispute for purposes of summary judgment unless otherwise noted. Defendant Buckman Laboratories International, Inc. is an ISO certified manufacturer of specialty chemicals for use in the pulp and paper, water treatment, leather, wood and coatings industries. (Def.'s Statement of Fact ¶ 1.) Technical Services is a division within Buckman's R&D Department. (*Id.* ¶ 2.) Technical Services personnel consists of its Director, Jon Thompson, salaried chemists, and hourly support personnel. (*Id.*) Plaintiff Archie Donald was hired by Defendant in July 1990. (*Id.* ¶ 3.) At the time of his termination, Plaintiff was a Sample Room Technician in

1

Defendant's Technical Services Department.  (*Id.* ¶ 4.)

## I. Reorganization of Defendant's Technical Services Department

In 2009, Thompson participated in an analysis of the business needs by industry within Technical Services.  (*Id.* ¶ 5.)  The data collected showed that the Water and Paper Divisions made up 80% of the customer orders received in Technical Services while the Leather, Wood, and Coatings (collectively "Leather") Division made up the remaining 20%.  (*Id.*)  To maximize the use of resources, Defendant decided to eliminate all laboratory distinctions and pool all the chemist positions into one laboratory.  (*Id.*)  The decision on how best to reorganize the Technical Services Department to better meet client demand, the new structure of the workgroups, and the logistics of the roll-out and implementation of these changes was coordinated with, vetted, and approved by Defendant's Human Resources ("HR") Department, the Legal Department, and the head of R&D Jim Fitzhenry prior to its implementation.  (*Id.* ¶ 6.)  The chemists and support personnel were informed of the reorganization on or about August 11, 2009.  (*Id.* ¶ 7.)

Prior to the reorganization, the lab had three work groups: (1) Paper, which consisted of three full-time chemists and one temporary; (2) Water, which consisted of four full-time chemists and one temporary; (3) Leather, Wood and Coatings ("Leather"), which consisted of three chemists and a support team made up of three full-time and one temporary technical person, all of whom worked with all the chemists in all three Divisions.  (*Id.* ¶ 8.)  Each of the three industry groups were led by their own group manager who was responsible for the management (e.g. evaluating the performance and coordinating the distribution of work, etc.) of the associates in the group.  (*Id.*)  After the reorganization, all existing chemists were co-managed by two group managers, Martha Holt (African-American) and Bob Antonie (caucasian).  (*Id.* ¶ 9.)  The two managers consulted with each

2

other in all significant decisions and in the assignment of work and both were responsible for directing the entire group of Technical Services chemists.  (*Id.*)[1]  This produced a single, co-managed, team of chemists working on paper, water, and leather projects, no longer one or the other exclusively.  (*Id.*)

As a part of the reorganization both Ms. Holt and Mr. Antonie became co-managers and retained the members of their work group as their direct reports and each group manager was assigned two chemists previously working in Leather; one of which included the former group manager for Leather.  (*Id.* ¶ 10.)  The chemists from the Leather group were re-assigned according to factors such as the associate's qualifications, experience, and familiarity with water or paper testing. (*Id.*)  Chemists were also assigned based upon skill set.  (*Id.*)  For example, there were only two chemists in Technical Services in August 2009 with the training and experience to work on Leather samples.  (*Id.*)  Thus, these two chemists were placed in separate groups so that each group had a chemist with these skills.  (*Id.*)  All chemists in Technical Services also began cross-training so that over time, all associates would have the capability to work on multiple types of samples.  (*Id.*)  Finally, the support personnel (which included Plaintiff), who previously reported to the manager of Leather, began to report directly to Thompson in August 2009.  (*Id.* ¶ 11.)

---

[1] Plaintiff has objected that this assertion taken from Thompson's declaration amounts to speculation that Hold and Antoine actually consulted each other.  According to Plaintiff, Thompson has no personal knowledge about whether Hold and Antoine consulted on "each and every decision."  Pl.'s Resp. to Statement of Fact ¶ 9.  It is not clear to the Court that this dispute is material.  Thompson's averment can be read to mean that based on the plan for the reorganization of the department, Hold and Antoine were expected to consult each other "in all significant decisions," not that they actually did so.  In fact, the reorganization plan was implemented in August 2009 and Plaintiff was discharged in October 2009.  Under the circumstances, whether Hold and Antoine actually consulted with each other has no bearing on whether Defendant engaged in unlawful discrimination against Plaintiff.

After the reorganization, the Technical Services lab was made up of one work group co-managed by the Group Managers and a group of support staff that reported to Thompson as follows: (1) Chemists work group, which was made up of twelve chemists co-managed by Ms. Holt and Mr. Antonie; and (2) Support Personnel, which was made up of two technical assistants, a sample room technician, and a Project Specialist managed by Thompson.  (*Id.* ¶ 12.)

## II.  Plaintiff's Internal Complaints about the Reorganization

On August 21, 2009, Thompson sent an email to the hourly support staff who became his direct reports following the reorganization (Archie Donald, Beverly Richmond, and Kathy White), announcing that their transition and alignment workshops pursuant to the reorganization of the department would be held on September 2, 2009 at the Doubletree Hotel in Memphis, Tennessee. (*Id.* ¶ 13.)  On August 24, 2009, at 10:39 a.m., Plaintiff sent Thompson an email expressing his dissatisfaction with the transition meeting for the support staff being held separately from the one transition workshop held for all the chemists reporting to both Mr. Antonie and Ms. Holt:

> Hello John, (sic)
>
> I'm hearing, and because all technical services were not copied on this thread, that the transition workshop for our department is going to be separate.  If this is the case, I am totally dissatisfied with this arrangement.  In your message below you state that 'we will be holding **'our'** Technical Services transition Alignment Workshop.  If we are one department **'our'** Technical services Transition Alignment Workshop should include everyone in the Technical Services department.
>
> I would like feedback from **'our'** group to discuss this situation within this thread.
>
> (*Id.* ¶ 14.)

In response to Plaintiff's email, Jairus Winfrey, a chemist, drafted an email at 12:18 p.m., stating that he saw the need for workshops for the realignment of direct reports with their respective supervisors;

4

however, the structure of the workshops appeared to him to cause segregation between the chemists

and support workgroups:

> Archie- I do see the need for transition work-shops for direct reports of Martha, Bob, and John (sic). I also see the need for the collect (sic) 'Tech Services' group to transition together as a TEAM. The changes that have taken place are greater than direct reports. Teaming has been a key component of our focus this year; however, the structure of these workshops appear to be causing some segregation within the teaming platform.

> (*Id.* ¶ 15.)

Within one hour of Winfrey's email, Plaintiff sent a response at 12:44 p.m., stating the following:

> My point exactly! Buckman is supposed to be a diversified company, but when I peer inside, I've seen and still see racial discrimination.

> (*Id.* ¶ 16.)

Because racial discrimination was mentioned in Plaintiff's email, the email trail was

forwarded to Defendant's HR Department for investigation. (*Id.* ¶ 17.) Defendant's HR generalists

Karen Damrell (caucasian) and Brenda Pendleton (African-American) met with and interviewed

Plaintiff regarding his claim of racial discrimination and segregation within the Technical Services

lab on August 24, 2009. (*Id.* ¶ 18.) It took Defendant a "day or two" to investigate Plaintiff's

complaint. (*Id.* ¶ 19.)[2] Defendant's HR Department determined that Plaintiff's complaint lacked

merit. (*Id.* ¶ 21.)

## III. Plaintiff's Attendance and Scheduled Hours

During the transition workshop, Plaintiff brought up the fact that he would like for Thompson

to have E-Time training because Thompson did not have non-exempt employees reporting to him

prior to the reorganization. (*Id.* ¶ 22.) Plaintiff wanted to make sure Thompson knew how to

---

[2] Plaintiff adds that the investigation began at 12:44 p.m. on August 24, 2009, and closed at 1:52 p.m. on August 25, 2009. Pl.'s Resp. to Statement of Fact ¶ 19.

approve his E-Time hours because Plaintiff was paid as an hourly employee. (*Id.* ¶ 23.) E-Time is a computer-based system that produces a log of the date and time an hourly associate scans in and out of Defendant's system using a hand scanner. (*Id.* ¶ 24.) Defendant's associates scan in and out to start and end their shift and any other time they leave the premises throughout the day. (*Id.* ¶ 25.) E-Time records are relied upon to determine the number of hours worked for the purposes of accurately compensating non-exempt employees. (*Id.* ¶ 26.) E-Time records are made contemporaneously by the computer system. (*Id.* ¶ 27.)

The concern about Plaintiff's attendance was discovered when Pendleton was providing the E-Time training to Thompson after the transition workshop. (*Id.* ¶ 28.) During the training Pendleton discovered that Plaintiff was arriving to work late almost every day, from 30 to 45 minutes to an hour late. (*Id.* ¶ 29.) Pendleton advised Thompson to address the issue of Plaintiff's tardiness with him. (*Id.* ¶ 30.) Plaintiff's regular shift ran from 8:30 a.m. to 5:00 p.m. (*Id.* ¶ 31.) Plaintiff testified that he had an arrangement with prior managers (i.e. before Thompson) that he could arrive at work between 8:30 a.m. and 9:00 a.m. so that he could take his daughter to school. (*Id.* ¶ 32.) Plaintiff adds that he was never admonished in 2009 for being tardy to work. There was nothing in writing confirming the arrangement Plaintiff alleges he had with prior supervisors for a modified work schedule. (*Id.* ¶ 33.) Defendant's handbook states that an employee's work schedule is determined at the discretion of the employee's manager. (*Id.* ¶ 34.)

Plaintiff had previously been admonished by his supervisor Jim Fitzhenry on December 23, 2003, for arriving tardy to work and was instructed by Fitzhenry not to arrive after 9 a.m.:

> This note serves to document our meeting today regarding our review of the current Buckman policies regarding attendance, overtime, and excused absences. As we discussed, each employee is expected to abide by these policies as stated in section 2.10, 2.11, and 2.12

6

of the operations manual.  Additionally, you and I have agreed that if you arrive as late as 9AM, you will make up that time by working until 5:30PM of that same day. **Please do not arrive later than 9AM.**

(*Id.* ¶ 35.)

Plaintiff could not recall if he ever explained any prior arrangement to arrive to work later than 8:30 a.m. to Thompson when Thompson became his supervisor in August 2009.  (*Id.* ¶ 36.)

On September 18, 2009, Thompson issued Plaintiff a verbal warning.  (*Id.* ¶ 37.)[3]  Based upon E-Time records from August 17, 2009 through September 18, 2009, Plaintiff had arrived late 16 times out of 28 days.  (*Id.*)  Plaintiff was put on notice that it was Thompson's expectation that he arrive on-time at 8:30 a.m. or be subject to further disciplinary action up to and including discharge.  (*Id.*)  Plaintiff testified that if Defendant's E-time record shows that he arrived at a certain time, the time reflected in the record would be accurate.  (*Id.* ¶ 38.)

That same day, September 18, 2009, Thompson also communicated with Beverly Richmond (caucasian), a purchasing assistant and member of the Technical Services Department support staff.  (*Id.* ¶ 39.)  Richmond's shift also began at 8:30 a.m.; however, Richmond would regularly arrive to work early (i.e. before 8:30 a.m.).  (*Id.*)  Thompson also changed Richmond's schedule so that she too would arrive at the start of her shift at 8:30 a.m.  (*Id.*)  On November 11, 2009, some two months after Richmond's work schedule was changed, Richmond made a formal request to Thompson and HR, seeking a modification in her scheduled 8:30 a.m. to 5:00 p.m. shift.  (*Id.* ¶ 40.)  Richmond disclosed a family health and care issue that could be accommodated by Defendant allowing her to arrive at work one hour earlier so that she could leave one hour sooner than her schedule allowed.

---

[3] Plaintiff disputes this fact and asserts that the warning came from HR, not Thompson. However, the evidence Plaintiff cites actually shows that Thompson met with him about his tardiness and reported his meeting to HR.  *See* Pendleton Dep. 112:4–21.

(*Id.* ¶ 41.)  On November 11, 2009, Thompson approved the modified schedule Richmond had requested, initially on a two-month trial basis before it became her regular schedule.  (*Id.* ¶ 42.)

There is evidence in the record that Plaintiff complained about his change in schedule alleging that Thompson was retaliating against him for making his earlier complaint about the reorganization of the Technical Services Department.  (Pl.'s Resp. to Statement of Fact ¶ 20.) Defendant's HR Department even engaged outside counsel to look into the claim.  (*Id.*)

## IV.  Plaintiff Misses the Calibration Session

On October 25, 2009, Thompson sent an email at 12:08 p.m., reminding ten Buckman associates including Plaintiff that a company meeting involving the entire R&D Department called a "calibration session" would be held on October 29, 2009, from 1:00 p.m. until 5:00 p.m.  (Def.'s Statement of Fact ¶ 43.)  Thompson was going to lead the calibration session.  (*Id.* ¶ 44.)  On October 29, 2009, less than one hour before the calibration session was to begin, Plaintiff drafted an email to HR, Thompson, and others, stating that he unilaterally decided not to attend the meeting because Thompson would be attending the meeting and a member of HR was not going to be present:

> The Calibration Session for Team Trek With Jon Thompson as the facilitator at 1 p.m. today I will not be attending.  I spoke with Karen [Damrell HR Generalist] and she informed me that she (sic) nor Brenda [Pendleton HR Generalist] knew anything about this meeting; therefore, I will not be attending this meeting today because Jon and I together without Human Resource supervision is not acceptable.  Arrangements need to be made to reschedule me for this meeting with another facilitator at another time.

(*Id.* ¶ 45.)

Plaintiff did not attend the October 29, 2009 meeting.  (*Id.* ¶ 46.)  There was never any agreement between Plaintiff and any member of Defendant's HR Department that a member of HR must

attendany meeting where both Plaintiff and Thompson would be present.  (*Id.* ¶ 47.)[4]

## V. Plaintiff's Meeting with Thompson and HR

The following day, October 30, 2009, Plaintiff, Thompson, and Pendleton met to review the results of Plaintiff's Third Quarter goals, to set his Fourth Quarter goals, and to discuss his missing the calibration session on October 29, 2009. (*Id.* ¶ 48.)  Immediately following the October 30, 2009 meeting, Thompson and Pendleton went to the office of Charles Westbrook ("Westbrook"), the vice president of Defendant's HR Department, and reported that Plaintiff had communicated a threat to Thompson during the meeting.  (*Id.* ¶ 49.)[5]  Specifically, Westbrook was told that Plaintiff was agitated, aggressive, and insubordinate in that he made statements refusing to deal or interact with Thompson directly, called him a liar, demanded a new supervisor, and requested that a severance package be prepared for him during the meeting.  (*Id.* ¶ 50.)  Westbrook was also informed that during the meeting Pendleton told Plaintiff that because Thompson was his manager, he would have to talk with Thompson.  (*Id.* ¶ 51.)  But Plaintiff again refused, stating that he would only go through

---

[4] Plaintiff disputes this assertion and states that after he filed his EEOC charge, "he was under the impression" that HR would attend any meetings where Thompson and Plaintiff would be present. Pl.'s Resp. to Statement of Fact ¶ 47.  The Court finds that Plaintiff's impression does not actually show that there was an agreement between Plaintiff and HR.  Therefore, Plaintiff has not actually disputed the contention.

[5] Plaintiff objects to the statement because it is based on the declaration of Charles Westbrook.  Plaintiff states the same objection to Defendant's Statements of Fact at ¶¶ 50–52.  According to Plaintiff, Westbrook lacks personal knowledge about what actually happened during the meeting between Plaintiff and Thompson and Pendleton.  However, the Westbrook Declaration does not purport to describe what actually transpired in the meeting but rather what Thompson and Pendleton reported to Westbrook about the meeting.  Clearly Westbrook possesses personal knowledge about the report he received.  Additionally, the information that Westbrook received is relevant to the issue of whether Defendant had an honest belief about Plaintiff's alleged threat to Thompson.  As such, the Court finds Plaintiff's objection to be without merit.

HR if he needed to communicate with Thompson.  (*Id.*)  According to the information Westbrook received, Plaintiff then leaned forward in his chair in an aggressive manner, squinted his eyes at Thompson and said the reason he would not deal directly with Thompson was to "keep both you [pause] and me [pause] safe."  (*Id.*)  Defendant construed Plaintiff's statement as a direct threat against his supervisor, which was witnessed and corroborated by a member of Defendant's HR Department.  (*Id.* ¶ 52.)

## VI.  Plaintiff's Termination

A collaborative decision was made to immediately suspend Plaintiff and send him home. (Id. ¶ 53.)  After considering all the facts and circumstances, a decision was made to terminate Plaintiff's employment.  (*Id.*)  Plaintiff was terminated for insubordination for failing to attend the October 29, 2009 calibration session and for communicating a threat to his supervisor Thompson.  (*Id.* ¶ 54.)  Defendant notified Plaintiff in writing of his termination.  (*Id.*)  According to Defendant, its Progressive Discipline Policy 3.6 is not applicable in situations such as Plaintiff's that involve acts of "open insubordination" and serious conduct such as communicating an independently verified threat to a direct supervisor.  (*Id.* ¶ 55.)[6]

## VII.  The Allegations of the Complaint

On October 27, 2010, Plaintiff filed a Complaint for employment discrimination and common law tort causes of action against Defendant.  (*Id.* ¶ 56.)  In his Complaint, Plaintiff lists four

---

[6] Plaintiff objects to this statement because he was never provided with a copy of the discipline policy in discovery.  Pl.'s Resp. to Statement of Fact ¶ 55.  Plaintiff adds that he has filed a motion to compel this and other discovery, which was pending before the Court at the time Plaintiff filed his response to the motion for summary judgment.  Plaintiff's motion to compel was referred to the United States Magistrate Judge for determination and denied on April 19, 2012 (D.E. # 34).  Plaintiff has not filed any objections to the Magistrate Judge's order, and the time for raising any objections has now passed.

causes of action for race discrimination (count one); hostile work environment (count two); intentional infliction of emotional distress ("IIED") and outrageous conduct (count three); and retaliation (count four).  (*Id.* ¶ 57.)

**A. Race Discrimination**

*1. Failure to Promote*

Paragraph 25 of the Complaint alleges that "Plaintiff was discouraged from applying for position(s) with the Company while other similarly situated non-protected employees were afforded more opportunities than Plaintiff."  (*Id.* ¶ 62.)  The Operator II position at Buckman required chemical plant experience as a minimum qualification for any candidate seeking the position.  (*Id.* ¶ 63.)  Plaintiff adds that Defendant waived this requirement for employees it wanted in the plant. (Pl.'s Resp. to Statement of Fact ¶ 63.)  Plaintiff did not have any chemical plant experience.  (Def.'s Statement of Fact ¶ 64.)  Although Plaintiff did not meet the basic qualifications for the job, Plaintiff applied for an Operator II position in August 2006.  (*Id.* ¶ 65.)  Westbrook explained to Plaintiff that he would not be considered for the Operator II position because he lacked the requisite experience and that Plaintiff would need to either get the training elsewhere or seek an entry level Operator Trainee (or Assistant Operator) position.  (*Id.* ¶ 66.)  However, one had not been open since 1986. (*Id.*)[7]

---

[7] Plaintiff admits that he has no information about whether such a position had not been open since 1986.  Plaintiff adds that this fact is based on the Westbrook Declaration and that the declaration is "self-serving," citing *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001).  The Court finds no merit in Plaintiff's position.  The contention that no Operator Trainee positions had opened since 1986 is a simple statement of fact that can either be verified or disputed.  The Ninth Circuit's holding in *Rodriguez* actually cuts against Plaintiff's argument.  In *Rodriguez*, the Ninth Circuit restated its rule that "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."  *Rodriguez*, 265 F.3d at 902.  Here Westbrook, Defendant's vice-

Plaintiff does not contend that he was qualified for the Operator II position.  (*Id.* ¶ 67.)
Plaintiff has no evidence that race played a factor whatsoever in the decision not to hire him for the
Operator II position in August 2006.  (*Id.* ¶ 68.)  Plaintiff does not remember the names of any of
the non-protected (caucasian) employees he alleges were promoted from the lab to the chemical plant
without the requisite experience.  (*Id.* ¶ 69.)[8]  Plaintiff does not know what positions the non-
protected employees, to which he compares himself, moved into when they were promoted to the
chemical plant.  (*Id.* ¶ 70.)  Plaintiff believes that the non-protected employees must have gone into
"entry level" positions.  (*Id.* ¶ 71.)

A year after applying for the Operator II position, Plaintiff expressed interest in applying for
an entry level Assistant Operator position that did not require chemical plant experience.  (*Id.* ¶ 72.)
On September 25, 2008, HR Generalist Karen Damrell received an email from Plaintiff stating that
he would like to apply for the Assistant Operator-Plant 1 position.  (*Id.* ¶ 73.)  Damrell informed
Plaintiff that the deadline to apply for the position had expired by almost one month before on
August 29, 2008.  (*Id.* ¶ 74.)  However, Plaintiff was allowed to proceed and was informed that his
application would be considered if he submitted an updated resume by the end of the day on
September 29, 2008.  (*Id.*)  On September 29, 2008, Plaintiff sent an email to Damrell stating that
he did not have time to do a resume and asked if his application would still be accepted if it were
submitted by the following morning, September 30, 2009.  (*Id.* ¶ 75.)  Damrell responded on

---

president of HR, stated the fact about the scarcity of openings in his declaration and averred that
his declaration was based on his personal knowledge.  The Ninth Circuit also observed that "any
affidavit of a party that is worth submitting is 'self-serving.'" *Id.* (citation omitted).  Therefore,
the Court finds no reason to disregard Westbrook's affidavit as "self-serving."

[8] Plaintiff states that another employee named Les Timbs was promoted to the plant
without the requisite experience.  Pl.'s Resp. to Statement of Fact ¶ 69.

September 30, 2009, and agreed to Plaintiff's request. (*Id.*) Damrell never received a resume or any

other documentation from Plaintiff on September 30, 2009. (*Id.* ¶ 76.) On October 6, 2009, Damrell

emailed Plaintiff inquiring about his resume. (*Id.* ¶ 77.) Later that day, Plaintiff responded by email

that since he was late with his application, he decided to withdraw his request to be considered for

the position. (*Id.*) Thus, Plaintiff was not considered for the position by his own request. (*Id.*) The

Assistant Operator position would have provided Plaintiff with an avenue to move into Defendant's

plant area without having prior chemical plant experience, an opportunity that had not been available

to Buckman associates since the mid-1980's. (*Id.* ¶ 78.)[9]

### 2. Reorganization of the Technical Services Department

Plaintiff lacks any evidence that Thompson or anyone at Buckman designed the work groups

for the purpose of segregating employees on the basis of race, other than what Plaintiff referred to

as the "look" of the lab. (*Id.* ¶ 79.) Plaintiff was not in any way involved in the decision to realign

the Water, Paper, and Leather groups in Technical Services. (*Id.* ¶ 80.) Plaintiff does not know what

factors Defendant's management considered in reorganizing the Technical Services laboratory. (*Id.*

¶ 81.)[10] Plaintiff does not know what qualifications each of the chemists who reported to Ms. Holt

and Mr. Antonie possessed. (*Id.* ¶ 82.) Plaintiff does not know the job titles of each of the chemists

---

[9] Plaintiff raises the same objection that the Court has already addressed. *See* note 7 *supra*.

[10] Plaintiff states in his responses that he believes that "race played a part in the way assignments, promotions, and schedules were made out in the lab." Pl.s' Resp. to Statement of Fact ¶¶ 81, 84. Plaintiff cites for support his own declaration, but his citation has left blank which specific paragraph supports his statement: "(Donald Dec., at ¶)." Other than his subjective belief, Plaintiff has not actually cited any evidence in the record. The Court finds that Plaintiff has simply restated his basic allegation in this lawsuit that Defendant engaged in unlawful discrimination.

in Technical Services.  (*Id.* ¶ 83.)  Plaintiff does not have any idea what Defendant's motivation was

in reorganizing the Technical Services Department.  (*Id.* ¶ 84.)  Plaintiff does not know whether

anyone above Thompson had to approve the reorganization.  (*Id.* ¶ 85.)  The group of chemists

reporting directly to Mr. Antonie and Ms. Holt has at all times been made up of chemists who are

caucasian, African-American, and of other nationalities and ethnicities working side-by-side.  (*Id.*

¶ 86.)[11]

## B.  Hostile Work Environment

Plaintiff's only support for a hostile work environment claim is Thompson's request that he

arrive to work by 8:30 a.m. and unspecified requests to "do" or "not do" unspecified acts.  (*Id.* ¶ 89.)

Plaintiff responds that his hostile work environment claim is based on "his long standing work clock-

n[sic] times, failing to investigate his complaints in an adequate investigation, accusing him of

threats to Thompson and then firing him."  (Pl.'s Resp. to Statement of Fact ¶ 89.)

## C.  IIED

In Paragraph 32 of the Complaint, Plaintiff alleges that acts such as "physically touching the

Plaintiff, making sexual comments to them (sic) in front of other employees, failing to respond in

a timely and reasonable manner to complaints of Plaintiff about Thompson's behavior" to support

his Intentional Infliction of Emotional Distress claim.  (Def.'s Statement of Fact ¶ 90.)[12]  Paragraph

34 of the Complaint alleges that "[a]s a direct and proximate result of Defendant's outrageous and

intentional infliction of emotional distress, Plaintiff has suffered damages."  (*Id.* ¶ 92.)  On May 17,

---

[11] Plaintiff adds that two chemists who worked in the lab during this period of time,
Bevester Page and Jarius Winfrey, are African-American.  Pl.'s Resp. to Statement of Fact ¶ 86.

[12] Plaintiff has conceded that the language suggesting "sexual conduct" was inadvertently
included in the Complaint.

2011, Plaintiff served his sworn responses to Defendant's first set of interrogatories and first request for production of documents.  (*Id.* ¶ 93.)  In response to Interrogatory No. 4, Plaintiff stated under oath that no diagnosis has been made by "any doctor, physician, psychologist, health care provider, or counselor concerning any injury, illness, condition or disability to Plaintiff allegedly caused by Defendant." (*Id.* ¶ 94.)  Plaintiff testified that besides seeing Dr. Slutsky for his high blood pressure, he did not have any other health or medical problems of any kind.  (*Id.* ¶ 95.)  Plaintiff testified that he has never had any problems with his mental health.  (*Id.* ¶ 96.)  According to Defendant, Plaintiff contradicted his sworn interrogatory answer when he testified in his deposition that the only support for his IIED claim is that he went to see Dr. Slutsky (for his emotional distress), who then referred him to Dr. Buchalter.  (*Id.* ¶ 97.)  Plaintiff also testified that Dr. Buchalter prescribed a sleeping pill so that Plaintiff could rest.  (*Id.*)  Plaintiff testified that the "outrageous" conduct that he complains of in this lawsuit is his supervisor's request that he arrive to work at the start of his scheduled shift and his belief that Thompson "lied" about Plaintiff threatening him.  (*Id.* ¶ 98.)

**D. Retaliation**

Paragraph 36 of the Complaint alleges that "Plaintiff engaged in protected activity by filing internal complaints against the Defendant."  (*Id.* ¶ 99.)  Plaintiff alleges in Paragraph 38, that he was written up for "minor infractions that were never the subject of discipline for the Plaintiff prior to the internal and external complaints of discrimination."  (*Id.* ¶ 100.)  Plaintiff contends these actions support his claim for retaliation.  (*Id.*)  Plaintiff testified that the only incidents of retaliation that he believes occurred at Buckman were being written up for "minor infractions" and having his work schedule changed by his supervisor Thompson.  (*Id.* ¶ 101.)  The only "minor" infraction that Plaintiff testified about to support his claim is being written up for is missing the calibration meeting

on October 29, 2009.  (*Id.* ¶ 102.)  Plaintiff adds that his claims for retaliation and hostile work environment based on race are supported by "the conduct of the Defendant in questioning his long standing work clock in times, failing to investigate his complaints in an adequate investigation, accusing him of threats to Thompson and then firing him."  Pl.'s Resp. to Statement of Fact ¶¶ 100–102.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving part "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[13]  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[14]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[15]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[16]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[17]  When determining if summary judgment is appropriate, the Court should

---

[13] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[14] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[15] *Celotex*, 477 U.S. at 324.

[16] *Matsushita*, 475 U.S. at 586.

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[18]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[19]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[20]  Finally, the "judge may not make credibility determinations or weigh the evidence."[21]

## ANALYSIS

The only claims remaining in this case are Plaintiff's allegations of race discrimination, hostile work environment on the basis of race, IIED, and retaliation.  The Court will consider the parties' arguments and the merits of each claim separately.

### I. Plaintiff's Motion to Compel

As an initial matter, the Court will address the status of discovery in the case.  In his response brief, Plaintiff states that the parties were then involved in a discovery dispute and that Plaintiff intended to file a motion to compel.  In fact, Plaintiff filed a motion to compel (D.E. # 27) on March 5, 2012, a few days after Plaintiff filed his response brief.  The motion to compel was referred to the United States Magistrate Judge for determination, and the Magistrate Judge denied the motion on

---

[18] *Id*. at 251-52.

[19] *Celotex*, 477 U.S. at 322.

[20] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[21] *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569 (6th Cir. 2012); *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

April 19, 2012.  Plaintiff did not file any objections to the Magistrate Judge's order, and the time for objections has now passed.  Plaintiff has not sought additional discovery by filing a motion under Rule 56(d) of the Federal Rules of Civil Procedure.  Under the circumstances, the Court finds any reference in the summary judgment briefing to Plaintiff's need for additional discovery to be moot.[22]

## II. Race Discrimination

Turning to legal arguments presented in Defendant's Motion for Summary Judgment, Defendant argues that it is entitled to summary judgment on Plaintiff's claim for race discrimination.  According to Defendant, even though the Complaint refers to physical touching and derogatory remarks made to Plaintiff about his race, Defendant points out that there is no evidence to support such a claim.  Thus, any claim based on these allegations, even if included in the Complaint by mistake, should be dismissed.

This leaves Plaintiff's discrimination claims based on Defendant's failure to hire Plaintiff for a position in its plant.  Defendant asserts that any allegation based on the failure to hire Plaintiff for a position in the plant is now untimely.  Plaintiff was denied the position of Operator II in January 2007 and then withdrew an application for the position of Assistant Operator in September 2008.  In either case, Plaintiff had one-year from learning of Defendant's decision not to give Plaintiff the job in which to file his EEOC charge.  Plaintiff did not file an EEOC charge until October 6, 2009, making his Title VII claim for these events untimely.  For the same reasons, any claim under the Tennessee Human Rights Act ("THRA") for the same denials of promotion had a

---

[22] *Cf. Bobo v. United Parcel Serv.*, Inc., 665 F.3d 741 (6th Cir. 2012) (reversing where the district court granted summary judgment in favor of employer on Title VII claims before ruling on the plaintiff's objections to a discovery order from the magistrate judge, the plaintiff's Rule 56(d) motion for additional discovery, and the plaintiff's request to complete a suspended deposition).

one-year statute of limitations and would now be untimely.  Moreover, even if the claim for the 2007 rejection was timely, Plaintiff cannot prove that he was qualified for the Operator II position or that a similarly situated non-protected employee was treated differently.  It is undisputed that Plaintiff lacked prior experience in a chemicals plant, which was a requirement for the Operator II position. Plaintiff also cannot identify any similarly situated non-protected employee who was hired as an Operator II without the requisite experience.  As for the opening for the Assistant Operator position in 2008, Plaintiff admits that he withdrew his application for that job.  Based on the undisputed facts, Plaintiff cannot make out these claims of race discrimination.

In his response in opposition, Plaintiff ignores Defendant's arguments about the timeliness of his promotion claims or his inability to show that he was qualified for the position of Operator II in January 2007.  Rather than addressing these dispositive arguments, Plaintiff posits that Defendant discriminated against him by requiring that Plaintiff report to work by 8:30 a.m.  Plaintiff maintains that Defendant treated him less favorably than a similarly situated white employee, Beverly Richmond, presumably because Defendant allowed her to report to work at 7:30 a.m.[23]

In reply to Plaintiff's argument, Defendant maintains that Plaintiff cannot show that Richmond was treated differently.  Plaintiff has admitted that Thompson instructed both Plaintiff and Richmond that they were expected to arrive at work by 8:30 a.m.  The evidence shows that Plaintiff regularly arrived later than 8:30 a.m. and Richmond much earlier.  The only evidence Plaintiff offers to show that the two were treated differently for similar conduct is his contention that Richmond told him she was allowed to come in early again some time after Plaintiff was dismissed.  Defendant

---

[23] The Court observes that Plaintiff's briefing on this issue cites heavily and correctly to relevant case law; however, Plaintiff never applies the legal principles cited to the facts of the case or discusses why they preclude summary judgment as to this race discrimination claim.

argues that not only is this evidence inadmissible hearsay but also that the record shows Richmond made a formal request to arrive early for her shift as an accommodation for a family health issue. This factor would show that Plaintiff and Richmond were not similarly situated. Therefore, Defendant argues that summary judgment is proper on this issue.

The Court holds that Plaintiff has failed to make out his prima facie case for race discrimination. Plaintiff has failed to oppose or in any way respond to Defendant's arguments about his failure to promote claims. District courts in this Circuit routinely grant summary judgment as to claims a plaintiff fails to support or address in a response to a motion for summary judgment.[24] Both claims are untimely, and Plaintiff has failed to adduce proof to establish all of the elements of his prima facie case for each.[25] Based on Plaintiff's waiver of these claims and for the reasons stated in Defendant's opening memorandum, the Court holds that Defendant is entitled to judgment as a

---

[24] *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 809 (M.D. Tenn. 2011); *Anglers of the Au Sable v. U.S. Forest Serv.,* 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008)*; Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F. Supp. 2d 789, 798 n.7 (W.D. Mich. 1999). *See also Clark v. City of Dublin,* No. 05-3186, 2006 WL 1133577, at *3 (6th Cir. Apr. 27, 2006) (where the appellant did not properly respond to the arguments asserted against his ADEA and ADA claims by the appellees in their motion for summary judgment, the appellant had abandoned his ADEA and ADA claims); *Conner v. Hardee's Food Sys.,* No. 01-5679, 2003 WL 932432, at *4 (6th Cir. Mar. 6, 2003) (finding that, "Because Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their . . . claim."); *Hazelwood v. Tenn. Dept. of Safety*, No. 3:05-cv-356, 2008 WL 3200720, at *8 (E.D. Tenn. Aug. 5, 2008).

[25] In order to make out a prima facie case of discrimination based on a failure to promote, Plaintiff must prove that (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time Plaintiff's request for the promotion was denied. *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (failure to promote in sex discrimination case). Plaintiff has not proven that was qualified for the Operator II position in January 2007 and has not shown that he actually applied for the Assistant Operator position in September 2008. Therefore, summary judgment would be proper on these claims.

matter of law on these claims.[26]   This leaves only Plaintiff's theory about Defendant requiring

Plaintiff to report to work by 8:30 a.m.  Where as here a plaintiff offers only circumstantial evidence

of unlawful discrimination, the Court analyzes the case using the burden-shifting framework

established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973).[27]   Plaintiff bears the initial burden to establish his prima facie case of discrimination by

showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment

decision, (3) he was qualified for the position, and (4) he was either replaced by a person outside of

the protected class or was treated differently than similarly situated non-protected employees.[28]

Plaintiff, however, has adduced no evidence from which a reasonable juror could conclude that he

and Richmond were similarly situated in all relevant respects.

Two employees must be "similarly-situated" in all relevant aspects of their respective

employment circumstances.[29]   The comparison employee (1) must have dealt with the same

supervisor, (2) have been subject to the same standards, and (3) have engaged in the same conduct

"without such differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it."[30]   These factors generally are all relevant considerations in

---

[26] It is clear that these claims were included in Plaintiff's original Complaint where the count alleging race discrimination stated that the acts of discrimination began in January 2007 and were based in part on Defendant discouraging Plaintiff from applying for promotions.

[27] *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

[28] *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008).

[29] *Bobo*, 665 F.3d at 751 (citing *Ercegovich v. Goodyear Tire & Rubber*, 154 F.3d 344, 353 (6th Cir. 1998)).

[30] *Ercegovich*, 154 F.3d at 352.

21

cases alleging differential disciplinary action.[31]   The evidence shows that Richmond like Plaintiff worked in the Technical Services Department and reported to Thompson.  The evidence also shows that Richmond like Plaintiff was told that she had to work her normally scheduled shift that began at 8:30 a.m. each day.  Plaintiff's theory of disparate treatment appears to be that Defendant later allowed Richmond to go back to her early arrival at work.   It is undisputed that some time after Plaintiff's discharge, Richmond made a formal request to report to work earlier than 8:30 a.m. in order to provide health-related family care.  While it is true that according to Plaintiff he reported to work late so that he could take his daughter to school, Plaintiff has not shown that he and Richmond were treated differently for engaging in the same type of conduct.  On the contrary, Plaintiff and his comparator were actually treated in the same manner: both were instructed that they needed to work a normal shift beginning at 8:30 a.m., and both employees complied.  Assuming that Defendant's accommodation for Richmond is relevant at all (the accommodation was granted after Plaintiff was terminated for reasons unrelated to attendance), Richmond made a formal request to be allowed to arrive early and explained her circumstances to her supervisor and HR.  There is no evidence that Plaintiff ever made a similar request or that his own circumstances were substantially similar to Richmond's situation.  As a result, the Court holds that Plaintiff has failed to make out this claim.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to this issue.

## II. Hostile Work Environment

Defendant next seeks judgment as a matter of law on Plaintiff's claim for hostile work environment on the basis of race.  Defendant argues that Plaintiff cannot show that he was subjected to unwelcome harassment or that such harassment was based on his race.  Plaintiff admitted that he

---

[31] *Id.*

22

never heard a racially derogatory remark or suffered any form of abuse in the workplace.  According to Defendant then, Plaintiff cannot prove that the work environment was objectively hostile, intimidating, or offensive.  Plaintiff's only evidence in support of the claim is Thompson's instruction to Plaintiff to be at work by 8:30 a.m. and generally to "do this, don't do that, do this."  In response, Plaintiff only argues that he has adduced evidence that Defendant ordered him to be at work by 8:30 a.m., failed to investigate his claims of discrimination properly, and finally dismissed him, all on account of his race.  In its reply brief, Defendant states, "Requiring an employee to arrive to work <u>on-time</u> is not harassment, is race neutral, and no line of legal authority supports Plaintiff's contention."[32]

Title VII prohibits discrimination that is "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment."[33]  In order to establish a prima facie case of a race-based hostile work environment, a plaintiff must demonstrate the following elements: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.[34]  The conduct must be so severe or pervasive that a reasonable person would find the workplace

---

[32] Def.'s Reply, 9 (D.E. # 29).

[33] *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)).

[34] *Newman v. Fed. Express Corp.,* 266 F.3d 401, 405 (6th Cir. 2001).

hostile or abusive, and that the victim must subjectively regard the workplace as abusive.[35]   The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."[36]   Conduct that is "merely offensive" is insufficient to support a hostile work environment claim.[37]

The Court must look at the totality of the circumstances to analyze whether the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[38]   Appropriate factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[39] "Isolated incidents. . . , unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."[40]   Additionally, the law draws a distinction between harassment and harassment that is based on a plaintiff's protected status.[41]   Therefore, only incidents that occurred because of a plaintiff's race are properly considered in the context of a claim of hostile work environment.[42]

---

[35] *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir. 2000).

[36] *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

[37] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).

[38] *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (citation and quotation makes omitted).

[39] *Id.* (quoting *Harris,* 510 U.S. at 23).

[40] *Bowman,* 220 F.3d at 463.

[41] *Howard v. Bd. of Educ. of Memphis City Schs.*, 70 F. App'x 272, 282 (6th Cir. 2003).

[42] *Id*. (citations omitted).

Applying these principles to the case at bar, the Court holds that Plaintiff has failed to come forward with any evidence that he was harassed on the basis of his race, let alone that such harassment was objectively hostile or extreme.  Plaintiff has not shown that Thompson's requirement that Plaintiff arrive at work by 8:30 a.m. or Defendant's alleged failure to conduct a thorough investigation of Plaintiff's allegations of discrimination were based on Plaintiff's race or that they were threatening, humiliating, or in any way interfered with Plaintiff's ability to do his job.  Viewing the record before the Court in the light most favorable to the non-moving party, Plaintiff has not demonstrated that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe and pervasive to alter the conditions of [his] employment and create an abusive working environment."[43]  Moreover, Plaintiff has relied on a series of discrete actions such as Thompson's treating Plaintiff differently by ordering him to arrive at work by a specified time, the HR Department's failure to investigate, and the termination of Plaintiff's employment.  Discrete acts "cannot alone amount to a hostile work environment."[44]  Therefore, the Court concludes that Plaintiff cannot prove the claim, and Defendant's Motion is **GRANTED** as to this issue.

### III. Intentional Infliction of Emotional Distress

Defendant also seeks summary judgment on Plaintiff's IIED or outrageous conduct claim. Defendant contends that Plaintiff has failed to show that Defendant engaged in any intentional conduct that rises to the level of culpability required to prove this cause of action.  For example,

---

[43] *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)).

[44] *Id.* (citation omitted).

Plaintiff bases his claim in part on the HR Department's investigation of his claim for discrimination. Relying on precedent applying Tennessee's doctrine of IIED, Defendant argues that an allegation of this kinds simply cannot support a claim for IIED under Tennessee law. Furthermore, Defendant argues that Plaintiff has not shown that he suffered an emotional injury as a result of Defendant's conduct. In his responses to interrogatories, Plaintiff stated that he was never diagnosed with any illness or condition allegedly caused by Defendant. Nevertheless, in his deposition, Plaintiff testified that he was prescribed a sleeping pill by one of his physicians. Even accepting Plaintiff's deposition testimony as true, Defendant contends that Plaintiff's condition is not sufficiently serious enough to make out the IIED claim. In response Plaintiff asserts that he has proof of a serious mental injury based on his own testimony about trouble sleeping and his need for sleeping medication. Plaintiff denies that he has to prove his mental injury by means of expert proof, an argument that Defendant does not actually make in its brief. Defendant has reiterated in its reply brief its principal argument that Plaintiff's allegations are not sufficiently severe enough to make out a claim for IIED.

In Tennessee, the tort of outrageous conduct is no longer to be referred to as an independent tort or as a synonym for the tort of intentional infliction of emotional distress.[45] Rather courts and litigants are simply to refer to the cause of action as the intentional infliction of emotional distress. To prove a claim for IIED, Plaintiff must show that: (1) the conduct complained of must be intentional or reckless, (2) it must be so outrageous that it is not tolerated by a civilized society, and

---

[45] *Rogers v. Louisville Land Co.*, — S.W.3d —, 2012 WL 1356664, at * 4 (Tenn. Apr. 19, 2012) ("Because having two names for the same tort—'intentional infliction of emotional distress' and 'outrageous conduct'—engenders potential confusion and misunderstanding and may lead to error, courts and litigants should no longer refer to 'outrageous conduct' as a separate, independent cause of action, nor as a synonym for the tort of intentional infliction of emotional distress.")..

(3) it must result in serious mental injury.[46]  Outrageous conduct does not include "mere insults, indignities, threats, annoyances, petty oppression or other trivialities."[47]  Thus, a plaintiff seeking damages for IIED must meet "an exacting standard," one which requires a plaintiff to prove conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."[48]  Tennessee courts have granted summary judgment on IIED claims as a matter of law.[49]  "Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it."[50]

Even viewing the evidence in the light most favorable to Plaintiff, the Court holds that Plaintiff has failed to prove his IIED or outrageous conduct claim.  Plaintiff has not even addressed Defendant's primary argument that the conduct Plaintiff complains of was not so outrageous that it is not tolerated by a civilized society.  To be sure, Plaintiff has made serious allegations that Defendant treated him differently on the basis of his race and retaliated against him for engaging in

---

[46] *Bain*, 936 S.W.2d at 622.

[47] *Id.* (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966)); *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 539 (Tenn. Ct. App. 2003).

[48] *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

[49] *Arnett*, 124 S.W.3d at 540 (affirming grant of summary judgment where IIED claim was based on race discrimination); *Weaver v. Pardue*, M2010-00124-COA-R3-CV, 2010 WL 4272687, at *5 (Tenn. Ct. App. Oct. 28, 2010) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.") (quoting Restatement (Second) of Torts § 46 cmt. h (1965)).

[50] *Arnett*, 124 S.W.3d at 540.

27

protected activity.  However, the Tennessee Court of Appeals has held that "discriminatory conduct does not automatically give rise to the imposition of liability for intentional infliction of emotional distress."[51]  Even if Plaintiff could establish his other claims of discrimination, the kind of conduct at issue here is not "so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious."[52]   Plaintiff alleges that in August 2009 he complained about the reorganization of his department due to his concerns that the plan had the effect of segregating African-American employees.  According to Plaintiff, management did not take his complaint seriously.  Plaintiff further alleges about a month later in September 2009, his supervisor gave him a verbal warning about arriving to work by 8:30 a.m.  Then Defendant terminated Plaintiff's employment at the end of October 2009.  Nothing in the proof is so outrageous or extreme as to support the IIED claim.  Furthermore, Plaintiff has failed to prove that he suffered a severe mental injury as a result of Defendant's conduct.[53]  Therefore, Defendant's Motion is **GRANTED** on this claim.

## IV. Retaliation

Finally, Defendant seeks summary judgment on Plaintiff's claim for retaliation.  Defendant argues that Plaintiff's claim is based on two acts of retaliation, disciplining Plaintiff for missing the October 29, 2009 calibration meeting and requiring Plaintiff to report to work by 8:30 a.m.  According to Defendant, Plaintiff admitted in his deposition that these two acts were the only

---

[51] *Id.*

[52] *Miller*, 8 S.W.3d at 614.

[53] *Geeslin v. Bryant*, 453 F. App'x 637, 639–40 (6th Cir. 2011) (holding that anxiety, sleeplessness, and prescriptions for sleeping pills not enough to constitute proof of "severe mental injury" required for IIED claim under Tennessee law).

retaliatory acts he was pursuing.  Defendant concedes that Plaintiff engaged in protected activity by making an internal complaint and that Thompson was aware of Plaintiff's complaint.  Defendant contends that Plaintiff cannot show any causal connection between his internal complaint in August 2009, and, even if he could, would not be able to show that Defendant's legitimate nondiscriminatory reason for disciplining Plaintiff was pretext.  The same is true for Plaintiff's claim that Defendant retaliated against him by requiring him to report to work by 8:30 a.m.  Defendant had a legitimate nondiscriminatory reason for requiring Plaintiff to arrive by that time, and Plaintiff has no proof that Defendant's reason was pretextual.  According to Defendant, Plaintiff's claim for retaliation must be dismissed.

Plaintiff argues in response that he not only made an internal complaint about perceived discrimination in August 2009 but also filed a formal charge with the EEOC on October 6, 2009. Plaintiff argues that he can show a causal connection between these protected activities and his termination on October 30, 2009, by virtue of temporal proximity alone.  Plaintiff further argues that he can show that Defendant's legitimate nondiscriminatory reason for his termination is pretext. Plaintiff posits that Defendant's reason had no basis in fact and did not actually motivate its decision to dismiss Plaintiff.  Plaintiff denies that he ever threatened Thompson during their meeting on October 29, 2009.  Plaintiff asserts that there is no evidence that he brandished a weapon, lunged at Thompson, or engaged in any other threatening behavior.[54]  Also Plaintiff denies that his failure to attend the calibration meeting was an act of insubordination.  Plaintiff also cites evidence that

---

[54] Plaintiff cites additional evidence that Thompson did not feel safe for some time after Plaintiff's dismissal and that Thompson may have discussed Plaintiff with counsel for Defendant on the day of Plaintiff's termination.  It is not clear to the Court why this evidence is relevant, and Plaintiff has not shown why it would create a question of fact as to his retaliation claim.

Defendant had notice of Plaintiff's EEOC charge at the time of his termination, even though Defendant does not dispute this element.

In its reply brief, Defendant first argues that Plaintiff's response contradicts his deposition testimony where Plaintiff stated that his retaliation claim was based on the change in his report time and discipline he received for missing the calibration meeting. Even so, Defendant contends that Plaintiff cannot prove a causal connection between his protected activity and his termination by temporal proximity alone.[55] Plaintiff has not adduced any other evidence to prove that Defendant's legitimate reason for his termination was actually pretext. According to Defendant, Plaintiff was fired for his insubordination by missing the calibration meeting and then for threatening Thompson in a follow-up meeting. Defendant argues that even if there was a fact question about whether Plaintiff threatened Thompson, Plaintiff's dismissal was justified by his refusal to attend the calibration meeting. In the alternative, Defendant argues that it had a honest belief in its conclusion that Plaintiff threatened Thompson.

The Court holds that Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim. As an initial matter, Plaintiff has waived his theory that Defendant retaliated against him by requiring him to report to work by 8:30 a.m. Defendant briefed this theory in its opening memorandum, and Plaintiff failed to address it in response even though Plaintiff pleaded it in his Complaint. Plaintiff has not argued that Defendant retaliated against him by compelling him to arrive at work by 8:30 a.m. Rather Plaintiff has responded that his retaliation claim is based on

---

[55] Defendant objects to Plaintiff's use of Defendant's privilege log as evidence to create an issue of fact. Specifically, Plaintiff has cited the privilege log to support his position that Defendant was aware of his protected activity. Because that element is not in dispute, the Court finds it unnecessary to address the privilege log or whether it may be used to support an assertion of fact.

his termination.[56]  Defendant argues that Plaintiff's theory in his brief is undermined by his own deposition testimony.  Although Defendant's argument is not without merit, the Court will analyze Plaintiff's October 30, 2009 termination as the basis for his retaliation claim for purposes of summary judgment.[57]

As for the merits of Plaintiff's retaliation claim, Plaintiff must demonstrate the following in order to make out a prima facie case of retaliation: (1) that he engaged in protected conduct; (2) that Defendant had knowledge of his protected activity; (3) that Defendant took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.[58]  It is undisputed that Plaintiff engaged in protected activity, that Defendant was aware of Plaintiff's protected activity, and that Plaintiff suffered an adverse employment action.  Assuming then that Plaintiff can establish these elements of his prima facie, the only disputed element is whether Plaintiff can prove a causal connection between his protected activities and his termination.

---

[56] *See* Pl.'s Resp. in Opp'n 10 ("Plaintiff can present sufficient evidence to establish a *prima facie* case of retaliatory discrimination because Buckman knew that Plaintiff engaged in legally protected activity and thereafter fired Plaintiff.") and 12 ("On October 6, 2009, the Plaintiff filed his first EEOC Charge and on October 30, 2009, Thompson fired the Plaintiff.")

[57] Even if the Court reached the merits of a retaliation theory based on Defendant's verbal warning about arriving at work by 8:30 a.m., the Court would conclude that Defendant is entitled to judgment as a matter of law.  A verbal warning about being punctual is not an adverse employment action.  *Bowman*, 220 F.3d at 462 (holding that *de minimis* employment actions are not materially adverse).  It also strikes the Court that the legitimacy of requiring employees to report to work on time speaks for itself.  Plaintiff has admitted that he did not arrive to work on time and simply argued that he had an informal understanding with other previous managers about coming in late.  Plaintiff has not shown how such a theory of retaliation could survive summary judgment.

[58] *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

In order to meet his burden, Plaintiff "must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity.[59]  In this case, Plaintiff engaged in protected activity by making an internal complaint to HR in August 2009 about the reorganization of the Technical Services Department and by filing an EEOC charge in October 6, 2009.  Where there is no direct proof of retaliatory intent, temporal proximity together with other circumstantial evidence may establish the causal connection.[60]  Because the Court must view the evidence in the light most favorable to Plaintiff and the filing of his EEOC charge occurred closest in time to Plaintiff's termination, the Court will focus on the causal connection between the EEOC charge and the dismissal.  Plaintiff has relied only on the temporal proximity of these events, a matter of about three weeks, to show that they were causally connected.  Although temporal proximity alone is generally insufficient to show a causal connection, the Sixth Circuit has held that in some cases temporal proximity alone can be sufficient as indirect evidence to establish the causal connection element of a prima facie case.[61]  In *Mickey*, for example, the plaintiff was laid off from his job the same day that the employer learned of the plaintiff's protected activity.[62]  Under the circumstances, the Sixth Circuit held that the plaintiff would be "unable to couple temporal proximity with any such other evidence of retaliation

---

[59] *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

[60] *Id*.

[61] *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004) (finding causal connection where "proximity between the protected activity and the adverse employment action is acutely near in time"); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

[62] *Mickey*, 516 F.3d at 525–26.

because his employer *immediately* retaliated against him upon learning of his protected activity."[63] In the case at bar, Plaintiff has not demonstrated when Defendant learned of his EEOC charge and has not adduced any other evidence to suggest a retaliatory motive to fire him.  Moreover, Defendant has offered a legitimate nondiscriminatory reason for its decision.[64]  On the other hand, the Sixth Circuit has held that a plaintiff can establish a causal connection on the basis of temporal proximity alone where the time span is only three weeks just as it was in this case.[65]  Therefore, the Court will assume for purposes of summary judgment that Plaintiff has met his relatively low burden to establish a causal connection based on temporal proximity alone.

Once a plaintiff has established a *prima facie* case of retaliation, thereby creating a presumption that the defendant has unlawfully discriminated against the plaintiff, the burden of production, but not the burden of persuasion, shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.[66]  Only if the defendant meets this obligation does the burden shift back to the plaintiff to "then prove that the proffered reason was actually a pretext to hide unlawful discrimination."[67]  Here Defendant has adduced evidence that Plaintiff failed to attend

---

[63] *Id.* at 526 (emphasis in original).

[64] *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401–402 (6th Cir. 2010) (collecting cases where other evidence in addition to temporal proximity was required to make out the prima facie showing for retaliation).

[65] *Seeger v. Cincinnati Bell Tel. Co., LLC*, — F. 3d —, 2012 WL 1592670, at *8 (6th Cir. May 8, 2012) (employee terminated three weeks after returning from FMLA leave); *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011); *DiCarlo*, 358 F.3d at 421–22; *Shefferly v. Health Alliance Plan of Mich.*, 94 F. App'x 275, 285 (6th Cir. 2004).

[66] *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).

[67] *Id.*

a mandatory meeting and later made a threat to his supervisor. Defendant argues that Plaintiff's refusal to attend the calibration meeting rose to the level of insubordination and cites for support its policy that progressive discipline does not apply to acts of "open insubordination."[68] "Insubordination may constitute a legitimate ground for dismissal."[69] Likewise, making threats in the workplace certainly is a legitimate nondiscriminatory reason for discharging an employee.[70] Therefore, Defendant has met its burden of production at this step, and the burden now shifts to Plaintiff to prove that Defendant's proffered reason was mere pretext.

After Defendant has proffered a legitimate reason for its adverse actions, Plaintiff now bears the burden to prove that Defendant's rationale for terminating him is pretext for discrimination. Plaintiff may show that (1) Defendant's stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain Defendant's actions.[71] Plaintiff argues that Defendant's stated reason, that Plaintiff made a threat to Thompson on October 29, 2009, had no basis in fact and was the not the actual reason for his termination. Arguably then there is a question of fact about whether Plaintiff threatened Thompson during their meeting.

In spite of this apparent fact dispute, the Court holds that Defendant is entitled to judgment

---

[68] Westbrook Decl. ¶ 16 (D.E. # 21-3).

[69] *Algie v. N. Ky. Univ.*, 456 F. App'x 514, 517 (6th Cir. 2012) (citing *Russell v. Univ. of Toledo,* 537 F.3d 596, 609 (6th Cir.2008)).

[70] *Jones v. W. Reserve Transit Auth.*, 455 F. App'x 640, 646 (6th Cir. 2012); *Theus v. GlaxoSmithKline*, 452 F. App'x 596, 602 (6th Cir. 2011); *Smith v. Leggett Wire Co.*, 200 F.3d 752, 759 (6th Cir. 2000); *see also Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 470–71 (6th Cir. 2002).

[71] *Chen*, 580 F.3d at 400.

as a matter of law on this claim.  Because "it is not in the interests of justice for [the courts] to wade into an employer's decisionmaking process," the Sixth Circuit has adopted the honest belief rule.[72] An employer is not required to show that it arrived at its decision in the "optimal manner" only that it "reasonably relied on the particularized facts that were before it at the time the decision was made."[73]  The Sixth Circuit has described the "key inquiry" as "whether the employer made a reasonably informed and considered decision before taking an adverse employment action."[74]  Here Defendant has shown that Plaintiff's remarks during the meeting were witnessed by Thompson and Pendleton, both of whom construed Plaintiff's statement as a threat and both of whom reported the remarks to Westbrook, Defendant's vice-president of HR.[75]  According to Westbrook, Thompson and Pendleton met with him and then, at Westbrook's instruction, prepared a statement about what had transpired during the meeting with Plaintiff.[76]  Defendant made the decision to suspend Plaintiff immediately and then, after considering the facts, to terminate Plaintiff's employment.[77]  Defendant had the testimony of two eyewitnesses who had the opportunity to hear and observe Plaintiff during the meeting.  Although Defendant did not interview Plaintiff, there is no requirement that an employer first give an employee the right to explain his actions.  Otherwise, it is not clear what

---

[72] *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citing *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 598–99 (6th Cir. 2007)).

[73] *Id.* (citation omitted).

[74] *Romans v. Mich. Dept. of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (citation and quotation marks omitted).

[75] Westbrook Decl. ¶ 9, 11.

[76] *Id.* ¶ 13.

[77] *Id.* ¶ 14.

further investigation Defendant could have undertaken.  Under the circumstances the Court holds that Defendant made "a reasonably informed and considered decision" to terminate Plaintiff's employment based on the testimony of Thompson and Pendleton.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to this claim.

## <u>CONCLUSION</u>

The Court holds that Plaintiff has failed to make out any of his claims for discrimination on the basis of his race.  Therefore, Defendant is entitled to judgment as a matter of law, and the Motion for Summary Judgment must be **GRANTED**.[78]

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: May 21, 2012.

---

[78] Due to the fact that none of Plaintiff's claims have survived summary judgment, Defendant's Motion to Bifurcate (D.E. # 14) the issues of liability and damages for trial is **DENIED** as moot.

36